# THE PRESIDENT, MANAGERS AND COMPANY OF THE BALTIMORE AND FREDERICKTOWN TURNPIKE ROAD *vs.* THE BALTIMORE, CATONSVILLE AND ELLICOTT'S MILLS PASSENGER RAILROAD COMPANY.

*Eminent Domain—Condemnation of the Property of One Corporation by Another—Constitutional Law.*

Property owned by a corporation is held subject to the power of eminent domain.

Where the law is constitutional, under which condemnation is sought, a Court of Equity has no power to arrest the proceedings by injunction, since a special tribunal is empowered to determine all the questions arising under the inquisition.

A railway company was authorized by an Act of the Legislature to construct and operate an electric railway upon the road of a turnpike company; to alter the grade of the road and change the location of tracks which the railway company was already operating as a horse

railway under a contract with the turnpike company; and the railway company was empowered to acquire the necessary easement and estate by condemnation.   The turnpike company filed a bill to enjoin the prosecution of condemnation proceedings, after damages had been assessed by a jury, upon the ground that the statute was in violation of the Constitution of the United States.   *Held*, that the Legislature had the power to determine when the grant to the turnpike company must yield to the grant made to another corporation for a public purpose, and that the railway company had the right to condemn the property of the turnpike company, including that embraced in its contract with the horse railway company, for the purpose of constructing the electric railway.  ·

Appeal from a deeree of the Circuit Court for Baltimore County (FOWLER, C. J., and BURKE, J.), sustaining a demurrer to the bill of complaint in this case and dismissing the same.   The bill sets forth, among other things, that the plaintiff derived its charter as a turnpike company under chapter 51 of the Acts of 1804, which Act is pleaded as a part of the bill, and under which it was vested with certain powers as to the maintenance of its road and the collection of tolls, forming an inviolable contract between itself and the State ; that in the year 1861 it entered into an agreement with the Baltimore, Catonsville and Ellicott's Mills Passenger Railway Company, the predecessor of the defendant, for the use of a portion of its turnpike upon which to construct a horse railway ; and that beside certain physical changes to be made in the bed of the turnpike and the construction of a bridge over Gwynn's Falls, all at the expense of the railway company, the said railway company, by way of toll for the use of said turnpike, agreed to pay a stipulated sum per annum ; to be $600 per annum from Baltimore City to Fairview Inn, and when the railway was completed as far as Catonsville, $900 per annum, and if extended beyond said point at the additional rate of $150 for every mile of turnpike road so used.   And that said agreement further provided for a revision of the rate of toll every five years, upon request by either party, and also the mode and standard by which such revision should be made. That the railroad was constructed in pursuance of said

agreement, from Baltimore City to Catonsville, and the plaintiff collected its toll of $900 per annum, for a number of years.  That in the fall of the year 1866, the turnpike and the railroad were both greatly injured by a destructive flood, and an agreement was made between the companies for a temporary suspension of tolls, repairs, etc.  That the railroad company was sold under a foreclosure of mortgage and reorganized under the name of the defendant, and the defendant had proceeded under the authority of the Act of 1894 to institute condemnation proceedings ; the application for the warrant and the inquisition both referring to the agreement of 1861, in these words :

"All other provisions of the agreement whereby the said Baltimore, Catonsville and Ellicott's Mills Passenger Railroad Company, as the successor of the Baltimore, Catonsville and Ellicott's Mills Passenger Railway Company, has authority to operate a horse passenger railway over said turnpike road, between Loudon Park Cemetery, in the city of Baltimore, and the point opposite the residence of Dr. MacGill, in the village of Catonsville, in Baltimore County, being left in full force and effect."

That, in the execution of said warrant and taking of the inquisition, which is now before the Court for confirmation, it was impossible to determine the bearing and scope of the clause cited, and it is now impossible to tell what rights of the plaintiffs are concluded by the inquisition, and whether said agreement will be in force as to the provision therein for payment of tolls, in case the inquisition is ratified, or whether the inquisition annuls it.  That during the taking of said inquisition, the defendant, the railroad company, claimed that the agreement as to payment of tolls was not in force, and that the jury should not consider it ; and the contrary contention was made by the turnpike company. That the evidence submitted to the jury showed that the proposed changes to be made by the railroad would necessitate an outlay on the part of the turnpike at the rate of about $5,000 per mile for the space of three miles, and the

verdict of the jury being for $10,000 only, would indicate that they had not considered the provisions in the agreement of 1861, relating to the payment of tolls.

The bill asks that the Act of 1894 should be declared unconstitutional so far as the plaintiff is concerned; that the Court may interpose to construe the agreement of 1861, and ascertain, determine and enforce the plaintiff's rights thereunder; and that an injunction may issue to restrain the defendants from prosecuting its present inquisition, or any proceeding to acquire an easement and estate in plaintiff's road.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, BRISCOE and ROBERTS, JJ.

*Arthur W. Machen* and *D. G. McIntosh*, for the appellant.

The charter of the appellant is a contract between the State and itself, and the rights thereby acquired cannot be subsequently invaded, even by the State itself. *Constitution of U. S.*, Article 1, section 10; *Hans* v. *State of Louisiana*, 134 U. S. 20; *Pennoyer* v. *Connaughy*, 140 U. S. 18; *Penn. R. R. Co.* v. *B. & O. R. R.*, 60 Md. 268; *State* v. *N. C. R. R.*, 44 Md. 164; *Canal Co.* v. *Railroad Co.*, 4 Gill & Johnson, 109 and 144; *Boston & Lowell R. R. Co.* v. *Salem & Lowell R. R. Co.*, 2 Gray, 1; *Commonwealth* v. *New Bedford Bridge*, 2 Gray, 339. Among the chartered rights of the turnpike company is the right and power to grade the bed of its road as it may determine from time to time.

But the Act of 1894, chapter 162, compels the turnpike company to submit to its terms, or by condemnation proceedings have the *railroad company establish its own grade over that portion of the road occupied by it,* and without reference to the grade of the other part. This is in manifest violation of a right of the appellant to determine its own grades, and one which is vital to its existence. This case therefore, differs from the case of *West River Bridge* against *Dix*, 6 Howard, 506, relied on by the appellee in the Court below in this material respect.

The Act of 1894 severs and divides the appellant's franchise, and it makes no provision for awarding compensation therefor. The use of electricity as a motive power, and the construction of double tracks by the railroad, provided for in the Act, means largely increased travel, and a proportionate increase in the number of cars transported along the turnpike, and subject to toll by the appellant. The right to exact toll constitutes the turnpike's franchise. It is a species of property distinct in law from the ownership of the road itself and other physical property. It is, in fact, the most important in value of all property owned by the turnpike company, and the roadbed would be worthless without it. The Act of 1894, if put into operation, by condemnation proceedings, must practically appropriate more or less of the franchise now enjoyed by the turnpike company, and work a condemnation of it to that extent. But it is submitted that no condemnation of a franchise can be had by piecemeal, even with legislative sanction. A franchise may be taken in its entirety and paid for, as was done in the *West River Bridge case*, but no authority can be found for dividing it up, or parceling it out, or holding it in fragments, in different hands. *Balto., etc., Co.* v. *Union Ry. Co.*, 35 Md. 224; *Boston Water Power Co.* v. *Railroad Co.*, 23 Pick. 366.

In these cases, as well as the case of the *Richmond Railroad Company* against *The Louisa Railroad Co.*, 13 Howard, 71, and many similar cases, the ground of the decision was that while the construction of the new road or improvements, as the case may be, might incidentally occasion some injury to the franchise of the pre-existing corporation, as by the building of a lateral rival road, or the crossing of one line by the other; yet that the original franchise was preserved in its integrity, and all the rights enjoyed under it, could be exercised as well after as before the condemnation. In this case the passage of cars along and over the roadbed of the turnpike, and through its gates, without the acustomed incident of paying toll, not only affects and impairs

its value, but it divides the franchise itself, and puts the railroad company in possession of a portion thereof. And see—*Monongahela Nav. Co.* v. *U. S.*, 148 U. S. 312, 328–34; *Greenwood* v. *Freight Co.*, 105 U. S. 16, 17.

Apart from the question of power in the Legislature to impair the value of a franchise or to destroy its entirety, it is denied that the Act of 1894 authorizes the exercise of such power, or makes proper provision for ascertaining the extent of the injury and awarding compensation. The grant of power in the Act is, " to acquire the easement and estate in the turnpike necessary for the exercise of the rights mentioned;" the rights mentioned being to use electricity as a motive power on its railway, and to construct and operate double passenger railway tracks on the turnpike in the manner specified, and to change the grades and location of the tracks. Nothing is said about the taking of the franchise, or a portion of it, nor for the ascertainment by the jury of its value, and allowing compensation therefor ; nor do the general provisions of the Code, Article 23, title " Condemnation of Property by Corporations," supply the omission. The property of a corporation may be condemned in whole or in part, and the franchise still remains in the company. Or the franchise may be taken without regard to the property. 35 *Md.* 224; *Worcester R. R. Co.* v. *Commissioners*, 118 Mass. 561. The Act here authorizes only the acquisition of an easement and estate in the turnpike road. There is no express grant of power to acquire the franchise, nor does it necessarily arise by implication. Upon the principle that the power exercised is extraordinary and against common right, there can be no such implication. *In re Boston & Albany R. R. Co.*, 53 N. Y. 574; *Alex. & F. R. R. Co.* v. *Alex. & W. R. R. Co.*, 75 Va. 780.

In the present case not only was an inviolable contract entered into by the State with the turnpike company, in the charter of the latter, but the turnpike company and railroad company made a valid contract with one another, and this latter contract was not only binding as between the parties,

but the State was disabled from passing any law impairing its obligation. By that contract the railroad company acquired the right to construct a railway in a certain manner and under certain conditions, and to run cars upon it drawn by horses, and without authority to use any other motive power, in consideration of the obligation assumed by it to pay for such use, as particularly provided in the written agreement. By virtue of this agreement only the railroad company obtained entrance upon the turnpike road, constructed the railway in the manner authorized by the turnpike company, and was allowed to run its horse cars thereon. But for the privilege so conferred, the turnpike company would now be able to enter into an agreement with any other railway company, possessing adequate powers for the construction and use of a railway upon its road. The contract, however, is of mutual obligation. The use of the railway constructed upon the turnpike road in manner provided in the agreement is secured to the railroad company ; and the turnpike company is secured against any other kind of use of the turnpike road by this railroad company or its assigns. The railroad company may use horse cars on the railway constructed for that purpose, but, without the consent of the turnpike company, can use no other kind of power. Under the agreement, the turnpike may be graded, in a manner authorized by the turnpike company and applied to the entire surface of its roadbed, but is not to be otherwise graded. The Act of 1894, chapter 162, attempts to authorize the railroad company to violate this contract, to use electricity as a motive power upon the turnpike road without the consent of the turnpike company, as well as to change the grades of the road and disregard the contract obligation to pay an annual sum in lieu of tolls.

*E. J. D. Cross* and *Geo. Dobbin Penniman* (with whom was *Milton W. Offutt* on the brief), for the appellee.

BRYAN, J., delivered the opinion of the Court.

By the Act of 1894, chapter 162, the Legislature granted

to the Baltimore, Catonsville and Ellicott's Mills Passenger Railroad Company the right to use electricity as a motive power on its railway between Baltimore City and Catonsville and on an extension of it thereafter to be made to Ellicott City.   By the same Act this corporation was empowered to construct and operate double passenger railway tracks on the turnpike of the President, Managers and Company of the Baltimore and Fredericktown Turnpike Road, with power to alter its grade, and to change the location of the tracks which it already had on the turnpike.   And the two corporations were authorized to agree upon the terms and conditions on which these rights should be exercised ; and in case they should fail to agree, the railroad company was empowered to acquire the necessary easement and estate by condemnation proceedings.

It is well known and it is stated in the proceedings in this case that by virtue of a contract with the turnpike company a passenger horse railway had been maintained and operated for many years on the bed of the turnpike between the city of Baltimore and Catonsville.   It does not seem to be controverted that the property of the corporation which originally owned this horse railway was sold under a foreclosure proceeding, and that the present appellee (under a slight change of name), has been invested with all its rights, property and duties, and subjected to all its obligations.   The appellee has prosecuted condemnation proceedings, and in due course the jury have found and assessed damages under their inquisition.   Without entering minutely into details, it is sufficient to state that the appellant filed a bill in equity, in which it alleged that the above mentioned Act of Assembly is contrary to the Constitution of the United States, and it prayed that the appellee should be enjoined from proceeding under the inquisition and from prosecuting any proceedings whatsoever by way of condemnation to acquire any easement or estate in the turnpike road.   The Circuit Court sustained the right of condemnation and the appellant took its appeal.

The turnpike company was chartered by the Act of 1804, chapter 51, and under this Act it constructed its turnpike road, and has operated and maintained it from the time of its construction to the present day.   There can be no doubt that the charter is a contract between the Legislature and the corporation, which is under the protection of the Constitution of the United States.   And the same may be said of the contract made with the predecessor of the appellee in reference to the construction of the horse railroad.   The Legislature has no power to amend, alter or impair any stipulation in either of these contracts.   They must all be preserved inviolate in their original integrity.   If the Act of Assembly infringes any right granted by the appellant's charter, or releases any stipulation contained in the contract, it must to that extent be declared null and void.   And it has been declared by this Court that there is no difference in principle between a law that in terms impairs the obligation of a contract, and one that produces the same effect in the construction and practical execution of it. *Canal Company* v. *Railroad Company*, 4 Gill & Johnson, 109.   In the same case, at pages 144 and 145, it was said that a franchise, a corporate right to select and acquire land for the authorized purposes of the corporation, is property; "it is an incorporeal hereditament; not a legal title to the land itself; not a mere capacity or faculty to acquire and hold land, such as every individual possesses; but, in addition to such capacity, it is a right or privilege, a portion of the eminent domain vested in the corporation to acquire the legal title to land, subjected by the grant to its will, and thus to convert the incorporeal into a corporeal hereditament; and after the franchise to choose and condemn land for any particular public purpose that portion of the eminent domain granted and subsisting in one corporation, can not be bestowed upon another, to the prejudice of the former grant; nor can any other legally acquire any such right of way or title to the land over which the franchise extends, as will hinder the former corporation in the exercise and

enjoyment of its franchise." Therefore the Legislature could not take away from the appellant the unrestricted right to the control and use of its road, and donate any portion of this right to the appellee. But there is a vital essential and paramount power belonging to the State which has never been surrendered to the General Government, and which is not limited or embarrassed by any considerations inferior to a regard for the public welfare. It is the right of eminent domain, or the right to take private property for the public use, with just compensation previously paid or tendered to the owner. The Legislature has the right to determine when private property shall be thus taken, and the duty devolves on the Courts to protect the rights of the owner by enforcing just compensation before it is taken. Whatever doubts may have existed at one time on the question, and it is probable they did exist when the case of the *Canal Company* was decided, it is now settled by authority which this Court is bound to obey, that " the grant of a franchise is of no higher order, and confers no more sacred title than a grant of land to an individual, and, when public necessities require it, the one, as well as the other, may be taken for public purposes, on making suitable compensation ; nor does such an exercise of the right of eminent domain interfere with the inviolability of contracts." *West River Bridge Co.* v. *Dix*, 6 Howard, 507 ; *Richmond Railroad Company* v. *Louisa Railroad Co.*, 13 Howard, 83. As was natural and proper these decisions have been followed in the opinions delivered by the State Courts. We forbear to cite any of them, inasmuch as we consider that the Federal authority marks out the course for us to follow, independently of any other consideration. It has been said by the Supreme Court that the power to take private property for public use " reaches back of all constitutional provisions." *Pumpelly* v. *Green Bay Company*, 13 Wallace, 178. It has also been said on this subject that a grant made for one public purpose must yield to another more urgent and important. Of course, it rests with the Legislature to deter-

mine when the necessity arises for making one public purpose subordinate to another which it regards as of a higher degree of utility. It is, of course, not held by any Court that the Legislature can bestow the property of any person, natural or corporate, upon another, but that private property cannot be exempted from the supreme right of eminent domain, on the ground that it is held by a chartered right. And, of course, the same must be said in cases where it is held by virtue of a private contract. We therefore feel obliged to hold that the Act of 1894, chapter 162, constitutionally conferred on the appellee the right to condemn the corporate property and franchises of the appellant, including such as were embraced within the scope of the contract in reference to the horse railway.

The statute law prescribes the mode in which the condemnation must be pursued. After the inquisition has been reduced to writing, and signed and sealed by the jury, it is required to be returned to the Circuit Court of the county, which is invested with the jurisdiction to confirm it or to set it aside. The value of the appellant's property and franchises will be very greatly diminished by the proceedings under this Act of Assembly; but for the injury thus done, including all damage which may be sustained by the seizure of its property, and any loss which may arise from an impairment of the value of its contract rights, it is the duty of the jury of inquisition to assess adequate compensation. The whole proceeding is subject to the power and control of the Circuit Court, which is the tribunal appointed by the law to afford redress where injustice has been committed by the jury. It is also its duty to see that the inquisition is regularly and properly conducted, and that the rights of the parties are duly protected. It is not competent for any other Court to exert this jurisdiction. It is held that where the law is constitutional, under which condemnation is sought, a Court of Equity has no power to arrest the proceedings by injunction; because a special tribunal is established for supervising the exercise of the right of eminent

domain, to which alone the power has been granted to hear and determine all questions which can arise regarding the inquisition.  *Western Maryland R. R. Co.* v. *Patterson*, 37 Maryland, 125 ; *Unreported Case of Same* v. *Keerl*, decided at the same time ; *C. & P. R. R. Co.* v. *Pennsylvania R. R.*, 57 Maryland, 267. ·

We think that the decree below ought to be affirmed.

*Decree Affirmed.*

(Decided April 19th, 1895.)